# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1639 | **DATE** | 7/15/2003 |
| **CASE TITLE** | Brotherhood of Maintenance of Way Employees vs. Union Pacific Railroad | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. It is hereby ordered that Plaintiff/Counter-Defendant's request for declaratory relief is hereby **denied**. It is further ordered that Defendant/Counter-Plaintiff's request for a preliminary injunction is hereby **granted**. A⫽

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 4 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 1 6 2003 | |
| | Notified counsel by telephone. | | date docketed | **25** |
| | Docketing to mail notices. | | | |
| ✔ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/15/2003 | |
| | | | date mailed notice | |
| FT/*secy* | courtroom deputy's initials | 03 JUL 15 AH 11:45 | FT | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, | ) ) ) | NO. 03 C 1639 |
| Plaintiff, | ) ) | |
| vs. | ) ) | Magistrate Judge Arlander Keys |
| UNION PACIFIC RAILROAD COMPANY, | ) ) | |
| Defendant. | ) | |



**DOCKETED**

JUL 1 6 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff, Brotherhood of Maintenance of Way Employees ("BMWE"), filed a complaint against Defendant, Union Pacific Railroad Co. ("UP"), for a declaration that UP violated Section 2 First of the Railway Labor Act ("RLA"), 45 U.S.C. § 152 First (West 2003), by refusing to submit the parties' dispute over the terms of a Settlement Agreement to expedited arbitration. UP filed a cross complaint, seeking to enjoin BMWE from engaging in a strike, work stoppage, picketing, or other form of self-help against UP over the dispute. For the reasons set forth below, the Court grants UP's Motion for an injunction and denies BMWE's request for declaratory relief.

25

**FACTUAL BACKGROUND**

BMWE is an unincorporated labor association, and is the collective bargaining representative for UP employees working in the craft of maintenance of way employee. (Pl.'s Compl. ¶ 1.) UP is a rail carrier, as defined by the RLA, and conducts rail operations in various states in the Midwestern and Western portions of the United States. (Def's Answer ¶ 2.) This case involves a disagreement between BMWE and UP over how to resolve disputes arising under an agreement ("Settlement Agreement") that settled a prior dispute between the parties. Both the prior and current disputes center around UP's decision to contract-out certain work involved in construction of a new railroad yard at Rochelle, Illinois (the "Rochelle Yard")

## A.    The Prior Dispute Between BMWE and UP

BMWE and UP are parties to a collective bargaining agreement ("CBA") that covers the territory known as the former Chicago and North Western Transportation Company. (*Id.* ¶ 5.) Under the CBA, UP agreed to employ workers represented by BMWE to construct, maintain, repair, rehabilitate, upgrade, and renew UP's track and right-of-way. (*Id.* ¶¶ 5, 6.) Rule 1(B) of the CBA, which sets forth the scope of work to be performed by UP's maintenance

2

workers, provides that BMWE workers "shall perform all work in connection with the construction, maintenance, repair and dismantling of tracks, structures and other facilities used in operation of the company in the performance of common Carrier service on the operating property." (CBA Scope Rule, Ex. 1 to Naro Aff. ) Rule 1(B) also provides exceptions under which work that is customarily performed by BMWE workers may be "contracted out." The exceptions include work that requires special skills, equipment, or material not possessed by UP and its employees, or where UP is not capable of handling the work or meeting necessary time requirements. (*Id.*)

On October 30, 2001, UP notified BMWE that it intended to contract-out work in connection with establishing a new facility in Rochelle, Illinois. (Letter from Naro to Fenhaus of 1/30/01, Ex. 2 to Naro Aff.) UP invoked the CBA's contracting-out exception by advising BMWE that "the project [was] of such magnitude that the Carrier [was] not adequately equipped to complete the project within the [necessary] time constraints." (*Id.*) BMWE responded that, because BMWE workers could complete the work within the necessary time constraints, the contracting-out exception was inapplicable to this instance. (Letter from Fenhaus to

Naro of 1/23/02, Ex. 3 to Naro Aff.) BMWE further claimed that UP was unilaterally changing and repudiating the CBA by contracting-out the work. (Bushman Decl. ¶ 11.)

UP disagreed with BMWE's characterization of the facts, claiming that it had complied with Rule 1(B) by serving notice that it would invoke the contracting-out exception, and meeting with BMWE in good faith to attempt to resolve the matter. (Letter from Naro to Fenhaus of 1/31/02, Ex. 4 to Naro Aff.) Further, UP asserted that the use of contractors was permissible under Rule 1(B) of the CBA, (id.), which provides that, if an understanding cannot be reached between the parties regarding the contracting-out of certain work, "[UP] may nevertheless proceed with said contracting and [BMWE] may file and progress claims in connection therewith." (CBA Scope Rule, Ex. 1 to Naro Aff.)

To attempt to settle the dispute, BMWE and UP representatives held several conferences and exchanged correspondence in late 2001 and early 2002. (Def.'s Answer ¶ 12.) Unfortunately, the parties were unable to resolve their differences. (Id.) On April 23, 2002, BMWE filed a complaint in federal court seeking declaratory and injunctive relief, and asserting that UP's actions would violate Sections 2 First and Seventh of the RLA. 45 U.S.C.

4

§ 152 First; 45 U.S.C. § 157 (West 2003). UP filed its Answer on April 23, 2003, and denied the allegations in BMWE's Complaint. (Pl.'s Compl. ¶ 14.) UP also asserted that the Court lacked subject matter jurisdiction to resolve the lawsuit, because the dispute was a minor dispute, subject to mandatory arbitration under the RLA. (Memorandum in Support of Cross-Plaintiff Union Pacific Railroad Company's Motion for a Temporary Restraining Order (hereinafter "UP's Brief"), at 7-8.)

On May 6, 2002, BMWE advised UP by letter of its intent to strike or engage in other self-help against UP. (Letter from Fenhaus to Naro of 5/6/02, Ex. 7 to Naro Aff.) In response, UP filed a Cross-Complaint on May 13, 2002, seeking to enjoin BMWE from engaging in self-help over UP's contracting-out of work involved in constructing the Rochelle facility. (Naro Aff. ¶ 10.)

The lawsuit was resolved when BMWE and UP signed a Settlement Agreement on June 12, 2002. (Settlement Agreement, Ex. 8 to Naro Aff..) The Settlement Agreement provided that: 1) UP could use contractors to construct the Rochelle Yard facility; 2) if a BMWE employee had an exercise of seniority, desired to work on the Rochelle project, and made this desire known to UP, UP would create a

position for the period of time the contract workers were performing work that arguably was in a sub-department in which the employee held seniority; and 3) UP would make a lump sum payment to be distributed among BMWE-represented employees who held seniority in the Rochelle Yard district. (*Id.*)

## B. The Present Dispute Between BMWE and UP

Consensus between BMWE and UP concerning work at the Rochelle Yard was short-lived. In the Fall of 2002, UP interpreted the Settlement Agreement in a manner that limited its obligation to provide positions for BMWE workers. (Pl.'s Compl. ¶ 16.) First, UP asserted that the Settlement Agreement did not require it to hire more BMWE workers than contract workers. (Pl.'s Compl. ¶ 17.) UP rejected BMWE's claim that, if UP hired even one contractor worker, UP was obligated to hire as many BMWE workers as met the Settlement Agreement's eligibility requirements. (Naro Aff. ¶¶ 12, 13.) Instead, UP contended that the Settlement Agreement contemplated only a one to one ratio of eligible BMWE workers to contract workers at the Rochelle Yard.

Next, UP asserted that its obligation to provide positions for BMWE workers at the Rochelle Yard ended once the contract workers left the site, even if the contract

workers later returned. (Naro Aff. ¶ 13.) UP claimed that BMWE workers who were furloughed along with the contract workers would not have an exercise of seniority if and when the contract workers later returned to work. (*Id.*) Finally, even though UP hired contract workers to perform drainage work at the Rochelle Yard, UP refused to provide comparable positions for BMWE workers.[1] (Pl.'s Compl. ¶ 17.)

Not surprisingly, BMWE challenged UP's interpretation of the Settlement Agreement. (*Id.*) In an attempt to appease BMWE, UP made a proposal to BMWE on November 14, 2002, offering to recall the furloughed BMWE workers if BMWE would drop its objections to UP's "one to one ratio" interpretation of the Settlement Agreement. (11/14/02 Letter from Naro to Bushman, Ex. 9 to Naro Aff.) BMWE flatly rejected UP's offer, and charged that UP's actions constituted unilateral changes to the Settlement Agreement, in violation of the RLA. (11/21/02 and 12/16/02 Letters from Bushman to Naro, Exs. 10 and 11 to Naro Aff.) UP

---

[1] The Court will refer to the parties' disagreement over these three points - 1) UP's insistence on a one to one ratio of BMWE workers to contract workers; 2) UP's refusal to recall furloughed BMWE workers; and 3) UP's failure to employ BMWE drainage workers - as the "Three Disputed Issues."

replied that its position on these "Three Disputed Issues," (see note 1), was justified under the Settlement Agreement, and, therefore, was a minor dispute under the RLA. (12/30/02 Letter from Naro to Bushman, Ex. 12 to Naro Aff.)

On January 23, 2003, BMWE offered to arbitrate the Three Disputed Issues in an expedited arbitration before a Special Board of Adjustment ("SBA"), pursuant to RLA § 3 Second. 45 U.S.C. § 153 Second (West 2003). (1/23/03 Letter from Bushman to Naro, Ex. 13 to Naro Aff.) BMWE asserted that minor disputes may be resolved either in the traditional manner of arbitration before the National Railroad Adjustment Board ("NRAB"), or in expedited arbitration before an SBA created by the parties. (Pl.'s Compl. ¶¶ 21, 22.) BMWE claimed that, while an SBA can often render decisions within several months via expedited arbitration, disputes that are submitted to the NRAB typically take more than three years from the initiation of the dispute to the final arbitral resolution. (Powers Decl. ¶¶ 5-10.) According to BMWE, use of expedited arbitration before an SBA is not atypical, and BMWE and carriers have often agreed to submit basic contract interpretation disputes to expedited arbitration, without presenting individual BMWE workers' claims or handling the claims "on

the property." (Powers Decl. ¶ 18; Ex. 5 to Powers Decl.; Ex. 6 to Powers Decl.)

BMWE complained that the sluggish pace of NRAB arbitration was problematic for several reasons. BMWE was concerned that an award at a future date would not remedy the total impact of UP's violation of the Settlement Agreement. (Second Powers Decl. ¶ 5.) Because the Rochelle Yard project was limited in duration, the project could be completed prior to the close of conventional arbitration, which would preclude an award requiring UP to provide BMWE workers with the work that they were entitled to perform. (Bushman Decl. ¶ 20.) It would also be difficult to determine when violations occurred and which BMWE workers were affected. (*Id.*) The longer it took to resolve the Three Disputed Issues, BMWE complained, the more likely that BMWE workers and their families would be without health insurance, and the more likely that the employees would lose seniority rights and the right to work when jobs later become available. [2] (Second Bushman Decl. ¶ 10.)

---

[2] Under the UP Employees National Health and Welfare Plan, a furloughed employee is entitled to only four months of employee and dependents health care insurance, after which coverage expires. (Second Bushman Decl. ¶ 9.) Under the 1986 National Agreement between major rail carriers and BMWE, if an employee with less than three years of seniority is furloughed for 365

9

In addition to the slow speed inherent in arbitrating disputes before the NRAB, BMWE complained that conventional arbitration of individual employees' claims also would not effectively resolve the Three Disputed Issues. (Powers Decl. ¶¶ 16, 17.) During arbitration before the NRAB, UP could challenge the eligibility of individual claimants to file claims, or construct similar procedural hurdles to avoid obtaining a comprehensive decision on the merits of the Three Disputed Issues. (Powers Decl. ¶ 16.)

Moreover, BMWE was concerned that arbitration of individual claims might not lead to an authoritative interpretation of the Settlement Agreement, and that such arbitration would enable UP to argue that any decision on an individual claim was limited to its particular set of facts in future arbitrations of similar claims. (Powers Decl. ¶ 17.) Thus, arbitrating individual claims before the NRAB would result in repeatedly and ineffectively arbitrating the same issues. (*Id.*) BMWE argued that the only effective method of ending the controversy would be to submit the Three Disputed Issues to an SBA. (*Id.*)

_____

days, that employee is "terminated" and loses all seniority. (*Id.* at ¶ 10.) BMWE estimated that there were between thirty and forty furloughed BMWE workers as of February of 2003, and that 25 remained furloughed as of April, 2003. (*Id. at* ¶ 6.)

On February 3, 2003, UP declined BMWE's request to submit the Three Disputed Issues to expedited arbitration, claiming that they had to be arbitrated according to the terms of the CBA and RLA. (2/3/03 Letter from Naro to Bushman, Ex. 15 to Naro Aff.) UP explained that the Three Disputed Issues were minor disputes and should be processed through the grievance procedure established by Rule 21 of the CBA, (Id.), which set forth the procedure for handling claims and grievances. (CBA, Ex. 14 to Naro Aff.) As such, UP denied that the Three Disputed Issues constituted a valid RLA Section 3 Second claim, and were not otherwise referable to the NRAB as required by Section 153 Second of the RLA. (Naro Aff. ¶ 18.) Therefore, UP was not required to agree to expedited arbitration before an SBA. (Id. at ¶ 21.)

UP argued that, although the RLA provides a process to resolve claims in an expedited manner, BMWE completely bypassed the RLA process for doing so. (Naro Aff. ¶ 23.) Once UP refused BMWE's request to establish an SBA, Section 3 Second of the RLA provided BMWE with the option to request the National Mediation Board ("NMB") to designate a member of the Board on behalf of UP to resolve the dispute. (Id.) BMWE failed to request that the NMB designate a member of the Board on behalf of UP. (Naro Aff. ¶ 24.)

While the parties argued over the proper resolution of the Three Disputed Issues, the limitations period for filing individual claims was about to expire. (Bushman Decl. ¶ 22.) On February 3, 2003, BMWE filed a claim on behalf of a majority of its BMWE workers to protect against the contractual sixty-day time limit for filing claims, in case it was later determined that it was necessary to file individual claims. (*Id.*) UP offered to submit the individual claims to an SBA, even though UP alleged that the claims were not ripe for arbitration. (Def.'s Answer ¶ 26.) BMWE refused UP's offer to arbitrate these claims before an SBA, because BMWE contended that doing so would not resolve the Three Disputed Issues. (Naro Aff. ¶ 22.) BMWE countered with an offer to arbitrate both the Three Disputed Issues and the individual claims, but UP declined. (*Id.*)

On March 21, 2003, BMWE threatened to engage in self-help at any time following March 31, 2003. (Letter from Bushman to Naro of 3/21/03, Ex. 17 to Naro Aff.) UP responded that, because the CBA set forth procedures for handling disputes over the interpretation and application of agreements, BMWE's threat to engage in self-help constituted a change in the terms of the CBA, which violated RLA Section 6. (Naro Aff. ¶ 25.) In addition, UP asserted that the

claim BMWE filed over UP's interpretation of the Settlement Agreement (i.e., the Three Disputed Issues) was a minor dispute, subject to the grievance procedures found in Section 3 of the RLA. (Naro Aff. ¶ 26.)

On March 31, 2003, UP sent to BMWE a letter denying all of the individual-employee claims filed by BMWE in its February 3, 2003 claim. (Letter from Tausz to Bushman of 3/31/03, Ex. 9 to Bushman Decl.) UP stated that the claim was defective, because: 1) it was a blanket claim for all BMWE workers on the relevant seniority roster; 2) the lump sum payment required by the Settlement Agreement barred all claims regarding the Rochelle Yard work; and 3) numerous claimants were ineligible to file, because they did not have seniority or did not make their availability known to UP, pursuant to the terms of the Settlement Agreement. (*Id.*)

BMWE asserted that the arguments raised by UP in denying the individual claims illustrated the problems inherent in handling the disagreement through individual employee claims. (Bushman Decl. ¶ 23.) Specifically, BMWE claimed that UP's arguments demonstrated that UP would construct procedural hurdles to prevent the comprehensive resolution of the dispute based on the merits of the substantive issues. (*Id.*)

13

## PROCEDURAL HISTORY

On March 6, 2003, BMWE field a declaratory judgment action, seeking a finding that UP had violated Section 2 First of the RLA by refusing to submit the Three Disputed Issues to expedited arbitration. (Pl.'s Compl., at 1.) BMWE also applied for injunctive relief under Section 2 First of the RLA. (*Id.*) BMWE argued that the court should compel UP to submit the Three Disputed Issues to expedited arbitration, and to bar UP's use of contract workers until UP acquiesced. (*Id.*)

On April 1, 2003, the parties appeared before Judge Anderson, and UP presented its motion for a temporary restraining order, seeking to enjoin BMWE from striking or engaging in any other self-help against UP. (Def.'s Mot. for T.R.O., at 1-2.) On April 14, 2003, UP filed a motion for a preliminary injunction, with supporting documentation, to enjoin BMWE from engaging in self-help against UP prior to the court ruling on UP's motions. (Def.'s Mot. For Prelim. Inj., at 1-2.) BMWE agreed not to initiate a strike or other forms of self help until the court's ruling on the preliminary injunction, thereby mooting UP's motion for the temporary restraining order. (Judge Guzman's 4/24/03 Min. Order).

On April 25, 2003, the parties consented to proceed before this Court. *See* Local Rule 73.1. The parties appeared before the Court on June 2, 2003, for a hearing on UP's motion for a preliminary injunction ("hearing"). At the hearing, the parties stipulated to their agreement to transfer the entire case to this Court. (Hr'g Tr., at pp. 39-40.) Likewise, the parties agreed that the underlying dispute regarding the interpretation of the Settlement Agreement was a minor dispute. (*Id.* at 6.)

BMWE again emphasized that arbitrating individual claims would not provide a definitive interpretation of the Settlement Agreement, (*Id.* at 7), and stressed that, when disputes involving major conceptual issues within collective bargaining agreements arise, parties have often submitted disputes to an SBA prior to handling the disputes on the property. (*Id.* at 19, 29.) BMWE claimed that, because UP declined an available method to resolve the disputes, UP did not exert "every reasonable effort" to settle the dispute, and, therefore, could not obtain an injunction. (*Id.* at 15.) To be eligible for an injunction, BMWE argued, UP was required to comply with all obligations imposed by law and to make every reasonable effort to resolve the dispute, including arbitration before an SBA. (*Id.* at 28-29.)

15

BMWE further claimed that UP's offer to submit the individual BMWE workers' claims to expedited arbitration did not satisfy the railroad's "every reasonable effort" obligation, (*Id.* at 24-25), but rather was an attempt to frustrate resolving the Three Disputed Issues by continuously fighting tiny battles. (*Id.* at 16.) Finally, BMWE argued that submitting the Three Disputed Issues to expedited arbitration would cause no harm to UP, whereas BMWE would be significantly harmed if the parties did not proceed in this manner. (*Id.* at 16.)

At the hearing, UP admitted that the Three Disputed Issues were related to the dispute over the Settlement Agreement, (*Id.* at 9), but again asserted that it refused to submit the Three Disputed Issues to expedited arbitration, because the parties had agreed to a process for handling grievances that required claims to be filed on behalf of individual BMWE workers. (*Id.* at 21.) UP asserted that it was being reasonable by agreeing to submit the individual BMWE workers' claims to an SBA, which were the claims that had been handled in accordance with the terms of the CBA, (*Id.* at 21.), and that by doing so, UP had done more than it was required to do by statute. (*Id.* at 23-24.)

UP claimed that BMWE's present dissatisfaction with the dispute resolution process, to which the parties had previously agreed, did not give BMWE the right to resort to self-help and to circumvent the provisions of both the RLA and the CBA. (*Id.* at 9-11.) The CBA has no provision, UP urged, permitting BMWE to force UP to expedited arbitration whenever BMWE decides that a major conceptual issue must be resolved regarding the CBA. (*Id.* at 21.) Instead, BMWE must rely on the provisions of Rule 21 of the CBA, which establishes the process for handling claims and grievances. (*Id.*) UP argued that, if BMWE is no longer satisfied with the dispute resolution process, it must go to Congress to change Section 3 Second of the RLA, and rely on the procedures of Section 6 of the RLA to change the collective bargaining agreement. (*Id.* at 24.)

Further, UP stressed that, in order to determine whether UP violated the Settlement Agreement, the details of each individual BMWE worker's claim must be addressed. (*Id.* at 12.) Specifically, UP argued that it was necessary to determine whether each BMWE worker had met the conditions set forth in the Settlement Agreement for a valid claim, by holding seniority, and by making his or her desire to work on the project and availability known to UP. (*Id.*)

17

UP also contended that BMWE had not met its duty to exert "every reasonable effort," which required BMWE to follow the procedures set forth in the CBA and the RLA to resolve disputes. (*Id.* at 31.) Finally, UP argued that the balance of harms test discussed by BMWE was not the balance of harms test that was applicable to this case. (*Id.* at 33.) The appropriate balance of harms test that the Court should look at in determining whether an injunction should issue, according to UP, is the harm BMWE would suffer if it were enjoined from striking, versus the harm that would occur if BMWE were permitted to strike. (*Id.* at 33.) UP asserted that the balance of harms favors UP, given the disruption in interstate commerce that would occur if BMWE were permitted to strike. (*Id.* at 34.)

**DISCUSSION**

Before addressing the merits of the parties' claims, the Court will set forth a summary of their arguments.

## I. THE PARTIES' ARGUMENTS

### A. UP's Position.

In UP's Memorandum in Support of Cross-Plaintiff Union Pacific Railroad Company's Motion for a Temporary Restraining Order ("UP's Brief"), UP argues that Section 2 First of the RLA imposes a legal obligation on unions

representing a railroad's employees to "exert every reasonable effort to make and maintain agreements . . . and to settle all disputes, whether arising out of the interpretation or application of agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof. (UP's Brief, at 2, citing 45 U.S.C. § 152 First (West 2003).) UP argues that, accordingly, the RLA provides peaceable procedures to resolve labor-management disputes, pending which strikes are unlawful and should be enjoined, notwithstanding the proscriptions of the Norris-LaGuardia Act ("NLGA"). (*Id.*, citing *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 42 (1957).)

UP contends that BMWE's threat to strike is unlawful, and that, therefore, the Court must enjoin BMWE from doing so. (UP's Brief, at 12.) UP argues that, by refusing to handle the Three Disputed Issues on the property per Rule 21 of the CBA, BMWE is attempting to change the terms of the CBA. (*Id.*) Thus, UP argues, BMWE's threat gives rise to a major dispute under the RLA. (*Id.*) As such, BMWE is not entitled to strike, because it failed to exhaust the RLA's procedures for resolving major disputes. (*Id.*)

UP also argues that it is not obligated to submit the Three Disputed Issues to expedited arbitration. (*Id.* at 13.) In support, UP cites Section 3 of the RLA, (*Id.*), which provides that:

> disputes between an employee or group of employees and a carrier . . . growing out of . . . the interpretation or application of agreements . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner; disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board.

45 U.S.C. § 153 First (i) (West 2003).

UP claims that Section 3 Second of the RLA does not require UP to submit the Three Disputed Issues to expedited arbitration, but instead provides BMWE with a process to force the disagreement to arbitration if UP refuses to establish an SBA. (UP's Brief, at 13-14.) However, a dispute must be "otherwise referable" to the NRAB before BMWE can invoke this process. (*Id.* at 14, citing 45 U.S.C. § 153 Second (West 2003).) Because the Three disputed Issues have not been handled in accordance with the CBA, they are not "otherwise referable" to the NRAB, UP argues. (*Id.*, citing 45 U.S.C. § 153 Second (West 2003).)

UP characterizes the parties' underlying disagreement[3] regarding the interpretation of the Settlement Agreement as a minor dispute, which is subject to mandatory arbitration under the RLA. (*Id.* at 18.) Therefore, the Court must enjoin any form of self-help by BMWE. (*Id.*) Because its interpretation of the Settlement Agreement is not frivolous or insubstantial, UP labels BMWE's claim that UP has departed from the terms of the Settlement Agreement a "minor" dispute. (*Id.* at 17-18, citing *Consol. Rail Corp. v. Railway. Labor Executives' Ass'n*, 491 U.S. 299, 307 (1989)); *see also Brotherhood of Locomotive Eng'rs Div. 269 v. Long Island R.R.*, 85 F.3d 35, 38 (2d Cir. 1996).

Regardless of the categorization of the dispute, UP claims that BMWE would violate its duty to exert "every reasonable effort" to settle disputes without disrupting commerce if BMWE struck over the disagreement or engaged in other self-help, and that the Court must enjoin such a conspicuous violation of Section 2 First of the RLA. (*Id.*

---

[3] The underlying dispute, as UP refers to it, is the dispute regarding whether or not the actions taken by UP were justified under the Settlement Agreement (i.e., The Three Disputed Issues). This dispute is distinguished from the dispute regarding BMWE's threat to strike unless UP submits the Three Disputed Issues to an SBA, which UP claims would be a change to the terms of the CBA and, thus, a major dispute.

at 5.) According to UP, BMWE did not exhaust any of the statutory mechanisms for orderly dispute resolution. (*Id.* at 20.) UP claims that BMWE's refusal to request the NMB to designate a member of an SBA on behalf of UP -- after UP declined to establish an SBA -- is just one example of BMWE's failure to exert "every reasonable effort" to resolve the dispute. (*Id.*); *see* 45 U.S.C. § 153 Second (West 2003). BMWE's rejection of UP's offer to establish an SBA for expedited arbitration of the individual claims of BMWE workers (even though these claims were not ripe for arbitration) is, UP argues, another example of BMWE's weak effort to resolve the parties' disagreement. (*Id.*)

Finally, UP argues that the public interest and balance of harms favor an injunction in this case. (*Id.* at 21.) UP contends that a strike will cause irreparable harm to UP, its employees, the public, commuters, and shippers. (*Id.* at 3.) According to UP, a strike would cease operations, deprive UP of income and the use of its facilities, and deprive employees of their work. (*Id.* at 21.) Likewise, the public would be harmed by interruption of essential freight and commuter transportation, including crucial freight and personnel essential to public welfare. (*Id.*) On the other hand, UP argues, an injunction would not harm

BMWE, because, if BMWE were to prevail in arbitration, an adjustment board under Section 3 of the RLA could grant BMWE workers complete relief. (*Id.* at 3.) Moreover, the RLA provides BMWE with the mechanism to accomplish expedited arbitration before an SBA, which is the goal of BMWE's threatened strike. (*Id.* at 22.) Thus, UP urges the Court to strictly enforce the RLA's command to arbitrate such matters by enjoining BMWE's attempt to sidestep the provisions of the RLA. (*Id.* at 3-4.)

## B. BMWE's Position

In BMWE's Memorandum in Opposition to Motions for Temporary and Preliminary Injunctions ("BMWE's Brief"), BMWE contends that it has not threatened to strike over the parties' differences concerning interpretation of the Settlement Agreement, but rather because UP insists that the disputes be arbitrated, and at the same time refuses to establish an SBA for expedited arbitration. (BMWE's Brief, at 1.) BMWE submits that UP's motion for an injunction should be denied for two reasons. (*Id.*) First, BMWE claims that, when UP refused expedited arbitration, UP violated its duty under Section 2 First of the RLA, to exert "every reasonable effort" to make and maintain agreements and settle disputes. (*Id.; see* 45 U.S.C. § 152 First (West

2003).) Specifically, BMWE argues that UP has rejected the manner of arbitrating the parties' dispute that would most efficiently and comprehensively resolve the disagreement.

Second, BMWE claims that the NLGA deprives the Court of jurisdiction to enter an injunction in this case, because Section 8 of the NLGA denies injunctive relief to any party in a labor dispute who fails to "comply with any obligation imposed by law . . . or who [fails] to make every reasonable effort to settle . . . dispute[s] either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." (*Id.* at 15-17, citing 29 U.S.C. § 108 (West 2003).)

In support of its position, BMWE directs the Court's attention to several Circuit Court decisions discussing both carriers' and unions' failures to live up to the "every reasonable effort" mandate of the RLA and NLGA. (*Id.* at 17-19.) According to BMWE, these decisions demonstrate that these statutes impose an enforceable legal obligation on carriers and unions, across a broad range of situations, to exert every reasonable effort to settle disputes. (*Id.* at 19.) BMWE argues that UP has failed to exert such effort by refusing to submit the Three Disputed Issues to an SBA-- the most effective means of resolving the dispute. (*Id.*)

24

BMWE rejects UP's contention that UP's statutory duties are limited to those found in Section 3 of the RLA. (*Id.* at 21-22.) In order to satisfy the RLA's "every reasonable effort" mandate, BMWE insists that UP must submit the Three Disputed Issues to expedited arbitration, even though BMWE has not properly handled the Three Disputed Issues on the property, per Section 3 of the RLA. (*Id.* at 21-22.)

BMWE also takes the position that UP comes to the Court with unclean hands. BMWE claims that UP is attempting to prevent the resolution on the merits of genuine contract interpretation issues, and instead is "trying to route BMWE down a maze" by offering to arbitrate individual BMWE workers' claims, which (BMWE claims) UP will attempt to derail with procedural obstacles. (*Id.* at 20.) BMWE is concerned that arbitrating individual employees' claims will not result in an authoritative interpretation of the Settlement Agreement, nor resolve the Three Disputed Issues. (*Id.* at 20-21.)

Additionally, BMWE argues that it has not violated the RLA and that, therefore, UP cannot satisfy Section 7 of the NLGA's requirement that it show that BMWE has engaged in unlawful acts. (*Id.* at 25-28.) BMWE claims that striking would not be an attempt to change the terms of the parties'

CBA without complying with the processes for changing agreements found in Section 6 of the RLA. (*Id.* at 25.) Rather, BMWE claims that it is attempting to achieve a comprehensive and efficient resolution to the parties' disputes surrounding the Settlement Agreement. (*Id.*)

BMWE then takes issue with UP's argument that BMWE has improperly bypassed the CBA's provisions for resolving the Three Disputed Issues. BMWE claims that the requirements for appeals by BMWE workers under Rule 21 of the CBA are excepted in situations where the appeal is from the highest officer designated by UP to handle such disputes. (*Id.* at 25-26.) It is BMWE's contention that it has addressed the dispute to UP's highest designated officer, who rejected BMWE's position. (*Id.* at 26.) Likewise, BMWE contends that Rule 21 of the CBA only applies to claims filed on behalf of individual employees, and that the claim to submit the Three Disputed Issues to an SBA is not a claim filed on behalf of individual employees, but rather is a claim by the Union. (*Id.*)

In response to UP's argument that the parties' disputes regarding the Settlement Agreement are minor disputes subject to mandatory arbitration, BMWE asserts that it is not planning to strike over interpretation of the Settlement

Agreement, but instead because UP has refused an effective method to resolve the dispute, in bad faith. (*Id.* at 27.) Also, UP's argument that BMWE failed to ask the NMB to appoint a member of an SBA on UP's behalf, according to BMWE, ignores UP's own argument that the Three Disputed Issues are not ripe for arbitration before an SBA. (*Id.* at 27-28.) Again, BMWE asserts that it is attempting to resolve the dispute efficiently and effectively, while UP is trying to route the dispute down a road of delay and incomplete resolution. (*Id.*)

Finally, BMWE contends that UP has not demonstrated that the balance of harms favors issuing an injunction, nor that the public interest supports issuing an injunction in this case. (*Id.* at 28-29.) UP cannot satisfy this burden, BMWE argues, because no harm will occur to the public if UP acquiesces to BMWE's demands, and UP will not be harmed in any way by submitting the Three Disputed Issues to expedited arbitration. (*Id.* at 28.)

In contrast, BMWE claims that it will be considerably harmed if the Court issues an injunction. (*Id.*) Further, BMWE urges that the strongest public interest in this case is effective resolution of the dispute, and that BMWE's

position furthers this interest, while UP's does not[4]. (*Id.* at 29.)

## II. ANALYSIS

### A. Major Versus Minor Disputes

The Court first addresses whether BMWE's objection to the actions taken and the positions asserted by UP regarding work at the Rochelle Yard, and regarding the Settlement Agreement, is a "major" or "minor" dispute under the RLA. Because the dispute involves the application and interpretation of the Settlement Agreement, the Court finds that the dispute is a minor dispute under the RLA.

The RLA does not refer to major or minor disputes, rather, the Supreme Court has supplied these labels to distinguish disputes regulated by Section 2 of the RLA from those regulated by Section 3 of the RLA. *Brotherhood of*

---

[4]     In its brief, BMWE also argued that the Court is without jurisdiction to enter an injunction, because the procedural requirements of the Norris LaGuardia Act ("NLGA") have not been observed.  Specifically, BMWE notes that Section 107 of the NLGA requires parties seeking an injunction to present live testimony, with the opportunity for cross-examination, before an anti-strike injunction can issue.  29 U.S.C. § 107 (West 2003). However, both parties had stipulated to proceed at the hearing without live testimony, and there is no dispute that the submitted evidence was reliable.  *See, e.g., Delta Air Lines, Inc. v. Air Line Pilots Assoc., Int'l,* 238 F.3d 1300, 1310-11 (11th Cir. 2001) (noting that live witnesses are not required where there is no dispute about the reliability of the evidence).

*Ry., Airline & S.S. Clerks v. Atchison, Topeka & Santa Fe Ry. Co.*, 847 F.2d 403, 405 (7th Cir. 1988). In broad terms, "major disputes seek to create contractual rights, minor disputes to enforce them." *Conrail*, 491 U.S. at 302 (citing *Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 (1945)).

Major disputes are disputes surrounding the formation of agreements or efforts to secure them. *Id.* (citing *Elgin*, 325 U.S. at 723). Major disputes occur when there is no existing agreement or where one party seeks to change the terms of an existing agreement. *Id.* (citing *Elgin*, 325 U.S. at 723.) Thus, a major dispute is not a dispute over whether or not an existing agreement controls the dispute. *Id.* (citing *Elgin*, 325 U.S. at 723). Rather, such a dispute concerns acquiring future rights, instead of asserting vested rights. *Id.* (citing *Elgin*, 325 U.S. at 723).

Minor disputes are disputes over existing agreements, or disputes where one party is not attempting to formally change the terms of the existing agreement, or to create a new collective bargaining agreement. *Id.* at 303 (citing *Elgin*, 325 U.S. at 723). A minor dispute is a dispute over the meaning of a certain provision in an agreement or its proper application in a certain instance. *Id.* (citing *Elgin*, 325 U.S. at 723). Thus, one party claims to have

vested rights, rather than attempting to create future rights. *Id.* (citing *Elgin*, 325 U.S. at 723).

Ultimately, minor disputes are those that can be conclusively resolved by interpreting an existing collective bargaining agreement. *Chi. & N.W. Transp. Co. v. Ry. Labor Executives' Ass'n* ("*Chicago*"), 908 F.2d 144, 148 (7th Cir. 1990). In other words, minor disputes concern interpreting or applying the terms of a collective bargaining agreement, whereas major disputes arise when one party desires to change those terms. *Id.*

Distinguishing major disputes from minor disputes is important, because the RLA specifies different procedures to resolve each type of dispute. To resolve major disputes, the RLA requires the parties to submit to a lengthy process of bargaining and mediation, during which they must maintain the status quo. *Brotherhood of Maint. of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 638 (7th Cir. 1997). During the status quo period, the employer is prohibited from implementing the changes contested by the union. *Conrail*, 491 U.S. at 302-03. If mediation fails, then the parties may submit the controversy to arbitration, yet participation is voluntary. *Id.*

If the parties do not reach agreement through mediation, the avenue to resolve the dispute is open-ended, and the parties are then entitled to resort to "raw economic force." *Atchison & Topeka,* 138 F.3d at 638. District courts possess subject matter jurisdiction to enjoin violations of the status quo, until the procedure for resolving major disputes, set forth in the RLA, is completed. *Conrail,* 491 U.S. at 303. The customary showing of irreparable injury is not necessary under these circumstances. *Id.*

In contrast to the open-ended nature of resolving major disputes, minor disputes are subject to compulsory and binding arbitration procedures under the RLA. *Id.* Such arbitration occurs either before the NRAB or an adjustment board established by the parties to the dispute. *Id.* The selected board then enjoys exclusive jurisdiction over the minor dispute. *Id.* at 304. Importantly, striking over a minor dispute is barred by the RLA. *Atchison & Topeka,* 138 F.3d at 638. Thus, courts are free to enjoin strikes that arise from minor disputes. *Conrail,* 491 U.S. at 304. Likewise, there is no general statutory obligation on the employer to maintain the status quo pending the decision of any adjustment board. *Id.*

The line between a major dispute and a minor dispute can be nebulous. In such instances, doubts are resolved in favor of finding the dispute at issue to be a minor dispute, because major disputes can potentially escalate into strikes that disrupt commerce. *Atchison*, 847 F.2d at 406. Thus, the party who attempts to establish that the controversy is a minor dispute faces a relatively light burden. *Conrail*, 491 U.S. at 306. "Where an employer asserts a contractual right to take a contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement.

Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id.* at 307. A claim is frivolous only if the interpretation is so implausible that it warrants the inference that "the [employer] is attempting to circumvent the major dispute procedures of the Railway Labor Act." *Nat'l Ry. Labor Conference v. Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 746 (7th Cir. 1987).

To determine whether a dispute can be resolved by interpreting an existing agreement, therefore making it a minor dispute, the court may look beyond the explicit terms of the written agreement. *Atchison*, 847 F.2d at 406.

Collective bargaining agreements contain both express and implied terms. *Conrail*, 491 U.S. at 312. It is common practice in the railroad industry to exclude non-essential terms from written agreements that are amenable to both parties. *Ry. Labor Executives Ass'n v. Norfolk & W. Ry. Co.* ("*Norfolk*"), 833 F.2d 700, 705 (7th Cir. 1987). Thus, when a court interprets a collective bargaining agreement, the court must interpret the agreement to include recognized past practices that establish the "course of dealing between the parties." *Atchison*, 847 F.2d at 407.

However, parties cannot use evidence of past practices to nullify the explicit language of a written agreement in order to recharacterize the dispute. *Id.* At 407, n.2. On the other hand, where the written agreement is silent regarding the practice in dispute, evidence of course of dealing may be instructive. *Id.* In this sense, a past practice may act as a binding unwritten term of the parties' collective bargaining agreement. *Chicago*, 908 F.2d at 154.

In the instant case, the underlying dispute at issue between the parties is a minor dispute. At the June 2, 2003 hearing on UP's motion for a preliminary injunction, the parties admitted that the underlying dispute regarding UP's interpretation of the Settlement Agreement was a minor

dispute. There is little doubt that the dispute involves UP's interpretation of the Settlement Agreement. Although UP's interpretation of the Settlement Agreement is subject to challenge, UP's position is not so obviously insubstantial as to constitute the sort of departure from an existing agreement that compels the inference that UP is trying to circumvent the major dispute procedures of the RLA. The Court finds, therefore, that the underlying dispute over the Three Disputed Issues is a minor dispute[5].

---

[5] Similarly, the Court finds that the parties' disagreement over the availability of expedited arbitration before an SBA is a minor dispute. UP claims that BMWE's insistence upon expedited arbitration of the Three Disputed Issues is an attempt to fundamentally alter the terms of the CBA-- Rule 21 in particular. BMWE responds that Rule 21 of the CBA, which sets forth the procedures for handling disputes on property, does not govern in this instance, because: 1)UP's highest designated bargaining officer has already offered his contrary interpretation of the dispute; and 2) the Three Disputed Issues are claims made on behalf of the union, not individuals, and Rule 21 applies only to individuals. During oral argument, UP contested BMWE's attempt to label Mr. Naro as UP's highest designated bargaining officer. Yet, UP did not offer any evidence countering its previous intimations that Mr. Naro occupied such a role, nor suggest who might surpass Mr. Naro in the chain or command. And while UP persuasively attacks BMWE's interpretation of Rule 21 and the CBA, the Court cannot agree that BMWE's interpretation is so frivolous as to warrant a finding that the dispute is a major dispute. Therefore, regardless of the motivation the parties assign to the threatened strike (i.e., the underlying dispute vs. the appropriate handling of the underlying dispute), the Court is presented with a minor dispute and will proceed accordingly.

## B. The Court's Authority to Issue an Injunction

Having determined that the present controversy involves a minor dispute, the Court must determine the extent of its authority in this matter. Under the RLA, federal courts may not become involved in minor disputes. *Brotherhood. of R.R. Signalmen v. Burlington N. R.R. Co.*, 829 F.2d at 620. Rather, the NRAB has exclusive jurisdiction to resolve such disputes. *Norfolk*, 833 F.2d at 704. As such, minor disputes are resolved under the procedures set forth in Section 3 of the RLA, and are subject to binding arbitration. *Chicago & N.W. Transp. Co. v. Int'l Bhd. of Elec. Workers*, 829 F.2d 1424, 1428 (7th Cir. 1987).

Although the substance of minor disputes must be resolved by the NRAB, federal courts are empowered to enjoin strikes over minor disputes, in order to preserve the NRAB's exclusive jurisdiction over such disputes. *Conrail*, 491 U.S. at 304. Likewise, striking over a minor dispute violates the RLA, and federal courts maintain jurisdiction to enforce the objective of the RLA and to preserve the NRAB's authority to resolve the dispute through compulsory arbitration. *Int'l Machinists*, 830 F.2d at 749. Therefore, the Court concludes that it has jurisdiction to enjoin a labor strike while arbitration before the NRAB is pending.

## C. The Interaction Between the RLA and the Norris-LaGuardia Act

BMWE concedes that district courts generally have jurisdiction to issue injunctions in minor dispute cases, but claims that the NLGA deprives this Court of its authority to issue an injunction in this specific case. An examination of the interaction between the RLA and the NLGA, however, contradicts BMWE's contention.

In cases where a railroad seeks injunctive relief against a union, a court must look to both the RLA and the NLGA to determine whether the court has jurisdiction to issue an injunction. *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1305 (11th Cir. 2001). The RLA is a labor statute that regulates the relationship between railroads and their employees. *Burlington N. R.R. Co. v. United Transp. Union*, 848 F.2d 856, 860 (8th Cir. 1988). The purposes of the RLA include avoiding interruption to interstate commerce by providing a mechanism to avoid strikes. *Id.*

The main duties imposed on carriers and their employees under the RLA are defined as follows: "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain

agreements . . . and to settle all disputes, whether arising
out of the application of such agreements or otherwise, in
order to avoid any interruption to commerce or to the
operation of any carrier growing out of any dispute between
the carrier and the employees thereof." 45 U.S.C. § 152
First (West 2003). In addition, "all disputes between a
carrier . . . and its . . . employees shall be considered,
and, if possible, decided, with all expedition, by the
carrier . . . and by the employees thereof interested in the
dispute." 45 U.S.C § 152 Second (West 2003).

Conversely, the NLGA removes jurisdiction from the
federal courts in labor dispute cases. *Burlington Northern*,
848 F.2d at 861. By withdrawing jurisdiction in such cases,
the NLGA is designed to remedy the federal courts'
historical anti-union bias, *id.*, and effectuates a basic
policy against enjoining the activities of labor unions.
*Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 772
(1961). The NLGA states that "[n]o court of the United
States shall have jurisdiction to issue any restraining
order or temporary or permanent injunction in any case
involving or growing out of any labor dispute to prohibit
any person or persons participating or interested in such
dispute . . . from . . . [c]easing or refusing to perform

37

any work or to remain in any relation of employment." 29 U.S.C. § 104 (West 2003). The NLGA makes certain that workers have the right to organize and conduct union activities without being interfered with, restrained, or coerced by employers or their agents through injunctions. *Burlington Northern*, 848 F.2d at 861.

The NLGA and the RLA have overlapping powers that must be accommodated and harmonized. *Id.* at 861. The way to accommodate the two statutes is to determine if specific provisions of the RLA are implicated, and if so, "the specific provisions of the [RLA] take precedence over the more general provisions of the [NLGA]." *Chicago River*, 353 U.S. at 42. In cases where the provisions of the RLA represent a policy that would be thwarted by strict enforcement of the NLGA, the NLGA's provisions against injunctions can be accommodated. *Burlington Northern*, 848 F.2d at 861 (collecting cases).

In fact, the Supreme Court has indicated that the proscriptions of the NLGA "cannot be read alone in matters dealing with railway labor disputes . . . . [t]here must be an accommodation of [the NLGA] and the [RLA] so that the obvious purpose in the enactment of each is preserved." *Chicago River*, 353 U.S. at 40. The Supreme Court has also

recognized that the more specific provisions of the RLA supersede the more general provisions of the NLGA. *Id.* at 41-42.

Thus, with only a few exceptions, injunctions to enforce the RLA do not contravene the NLGA. *Chicago*, 908 F.2d at 157. A court may grant injunctive relief to vindicate the provisions of the RLA and to enforce the procedure set forth under the RLA to resolve minor disputes, notwithstanding the provisions of the NLGA. *Chicago River*, 353 U.S. at 40-42. Similarly, in the case at bar, the NLGA does not bar the Court from issuing an injunction. UP claims, and the Court agrees, that an injunction is necessary to enforce compliance with the RLA's specific minor dispute resolution procedures and to prevent BMWE from engaging in an unlawful strike. Under these circumstances, the NLGA prohibition against injunctions gives way to effectuate the purposes of the RLA.

## D. UP's Duty to Exert Every Reasonable Effort

Having determined that the Court has jurisdiction to issue an injunction in this matter, the Court turns to BMWE's arguments that the Court should nevertheless reject UP's request for an injunction. BMWE argues that Section 2 First of the RLA and Section 8 of the NLGA dictate denying

UP's request for an injunction, because UP has not exerted every reasonable effort to resolve the parties' dispute. The Court disagrees.

Section 2 First of the RLA requires carriers and unions "to exert **every reasonable effort** to make and maintain agreements . . . and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier." 45 U.S.C § 152 First (West 2003) (emphasis added). The Supreme Court has indicated that the RLA's mandate to exert every reasonable effort is a legal obligation that is enforceable by the courts, rather than merely a statement of policy. *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 574-76 (1971). This provision is an independent obligation imposed upon the parties to reach agreements, and prevents a party who merely "goes through the motions" or negotiates in "bad faith" from satisfying their obligations under the RLA. *Assoc. of Flight Attendants, AFL-CIO v. Horizon Air Indust. Inc.*, 976 F.2d 541, 544 (9th Cir. 1992); *see also, United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 361 (7th Cir. 2001)(the duty imposed by Section 2 First of the RLA is necessary to preempt disruptions to commerce, which was a major reason why Congress enacted the RLA.)

The NLGA contains a similar "every reasonable effort" provision, preventing parties that lacks clean hands from obtaining injunctive relief. Section 8 of the NLGA states that a party may not obtain injunctive relief if the party has "failed to comply with any obligation imposed by law . . . or has failed to make *every reasonable effort* to settle such dispute either by negotiation or with the aid of any available government machinery of mediation or arbitration." 29 U.S.C. § 108 (West 2003)(emphasis added).

BMWE cites several cases to support its contention that UP is acting in bad faith and is failing to exert every reasonable effort to settle the parties' dispute, under both the RLA and the NLGA. BMWE primarily relies on the Supreme Court's decision in *Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad*, 321 U.S. 50, 58 (1944).

The *Toledo* Court stated that Section 8 of the NLGA imposes both a duty on a party to discharge its legal obligations, and a duty to make every reasonable effort to settle the dispute, with the latter duty being broader than merely meeting one's legal obligations. *Id.* at 56-57. The case arose out of a protracted labor dispute between a carrier and its employees regarding working conditions and rates of pay. *Id.* at 51-55. Following lengthy negotiations

41

and mediation between the parties, the NMB proposed voluntary arbitration pursuant to the provisions of the RLA. *Id.* at 51. The union ultimately agreed to submit to voluntary arbitration, but the carrier did not. *Id.* at 52- 53. After the employees struck, the carrier filed a complaint in federal court, seeking injunctive relief. *Id.* at 53.

The Court held that, although arbitration was voluntary under the RLA, and thus the carrier was not legally required to submit to it, arbitration was an available mechanism for resolving the dispute, and submitting to such arbitration would involve a reasonable effort by the carrier to settle the dispute. *Id.* at 56. Because the carrier refused an available mechanism to resolve the dispute – a mechanism that was reasonable and expressly provided for in the RLA – the Court held that the carrier did not exert "every reasonable effort" to resolve the dispute. As a result, the NLGA deprived the district court of the power to offer injunctive relief. *Id.* at 60.

BMWE also relies on *United Air Lines, Inc. v. International Association of Machinists & Aerospace Workers,* 243 F.3d 349, 361 (7th Cir. 2001), in support of its claim that the RLA and NLGA's "every reasonable effort"

requirement dictates that UP utilize expedited arbitration before obtaining an injunction.

In *IAMAW*, the Seventh Circuit held that, under Section 2 First of the RLA, a union was obligated to attempt to discourage a work slowdown during the status quo period, even though the union claimed that it had not initiated the slowdown, and that the airline could more effectively end the slowdown. 243 F.3d 349. The dispute began during negotiations to amend the parties' collective bargaining agreement, when the airline started to experience numerous maintenance-related problems, such as increased numbers of maintenance write-ups, and increased maintenance-related flight cancellations and delays. *Id.* at 353. The airline interpreted the anomalies as a deliberate "slow down" campaign by the mechanics, in response to misleading communications between the mechanics' union and the mechanics, regarding the airline's bargaining stance. *Id.* at 353-54.

In addition to the maintenance-related anomalies, letters and bulletins were repeatedly posted by the union, reminding the mechanics to "work safe," which were common code words used by unions to call for a work slowdown. *Id.* at 355-357. The airline reminded the union that it was

required to maintain the status quo throughout negotiations. *Id.* at 354. The union denied that it had encouraged the mechanics to violate either the CBA or the RLA. *Id.* The airline then moved for injunctive relief. *Id.* The union contested the injunction on the ground that the airline had not made every reasonable effort to avoid the dispute, because the airline could have simply identified and punished the offending mechanics.

The Seventh Circuit held that an injunction may be obtained to prevent the union from violating specific provisions of the RLA, even if it was determined that the airline could more effectively control the violation by directly disciplining individual mechanics. *Id.* at 363. Whether the airline could stop the work slowdown through its own actions or not, the union had its own independent obligation to exert "every reasonable effort" to end the slowdown. *Id.* The court stated that "requiring [the airline] to take efforts to end the slowdown would not be an 'effective means' of enforcing [the union's] duty to 'exert every reasonable effort to make an maintain agreements'; rather, it would [require] [the airline] to assume [the union's] duty altogether." *Id.*

BMWE goes on to cite additional cases discussing the every reasonable effort requirement. These cases demonstrate that the every reasonable effort requirement is often tied to bad faith on the part of a carrier, *see, e.g. Association of Flight Attendants, AFL-CIO v. Horizon Air Industs., Inc.[6],* 976 F.2d 541 (9th Cir. 1992) (while evidence of mere hard bargaining doesn't constitute bad faith, a carrier who merely goes through the motions of bargaining and engages in dilatory tactics to delay and derail negotiations has not satisfied the every reasonable effort requirement), or bad faith on the part of the union *Burlington Northern & Santa Fe Railway Co. v. Brotherhood of*

---

[6] The court found that the airline was hostile toward the collective bargaining process and that it had attempted to destroy the negotiation schedule by not allowing flight attendants to be released from their duties to attend the sessions, despite BMWE's offer to pay for lost time. *Id.* at 546. Moreover, the airline refused to meet on Mondays, Tuesdays, Friday afternoons, and weekends, to negotiate with the union. *Id.* The airline intentionally made contract proposals that were obviously objectionable to BMWE, repeatedly belittled BMWE's proposals, and repeatedly made derogatory comments about the negotiation process. *Id.* Finally, the airline sought to bargain directly with the flight attendants, in violation of the RLA. The court distinguished between an airline's right to engage in hard bargaining and the RLA's prohibition against bargaining in bad faith and failing to exert every reasonable effort to reach an agreement. Based on the facts of the case, the court found that the airline had engaged in mere pretense of bargaining, and that it failed to exert "every reasonable effort" to reach an agreement. *Id.* at 547.

45

*Maintenance of Way Employees,* 286 F.3d 803, 806 (5ᵗʰ Cir.
2002) ("unions deliberate policy of repeatedly calling
surprise strikes violates" the every reasonable effort
requirement.)

These cases support BMWE's position that a party cannot
merely discharge its legal obligations to satisfy the RLA
and NLGA's every reasonable effort requirement. However,
the caselaw does not compel a finding that UP's refusal to
submit the Three Disputed Issues to an SBA for expedited
arbitration violates either the RLA or the NLGA. To hold
otherwise would be to define "every reasonable effort" as an
obligation by a party to surrender its superior negotiating
position and agree to dispose of a previous agreement at any
time when the opposing party becomes dissatisfied with the
provisions of the agreement.

This is not to say that the duty to exert "every
reasonable effort" is insignificant. However, it is not a
trump card to be played to invalidate an existing agreement
when one party no longer finds the agreement favorable to
its cause. Even though the duty to exert every reasonable
effort requires a party to do more than discharge its legal
obligations, this duty cannot nullify the express terms of
the agreement itself. A party cannot, in the name of every

reasonable effort, circumvent the provisions of a contract that it voluntarily entered into, and subsequently command the opposing party to handle disputes in a manner that is not set forth in the contract.

UP is correct in asserting that there is no provision of the CBA that allows BMWE to force UP into expedited arbitration whenever BMWE decides that a major conceptual contract issue exists. Rather, BMWE and UP agreed to abide by the provisions of Rule 21 of the CBA to resolve grievances. Thus, while there are no provisions in the CBA that enable BMWE to strike in this instance, the CBA does include specific provisions that BMWE would violate by engaging in self-help.

The process for resolving minor disputes under the RLA is a lengthy process, and it has been a lengthy process for years. When BMWE and UP negotiated the current CBA, BMWE was well aware of the protracted nature of the RLA's minor dispute resolution procedure. There are mechanisms available to BMWE if it desires to change the terms of the CBA or the RLA, but they do not include threatening to strike. Section 6 of the RLA provides a process for BMWE to change the terms of the CBA, and if BMWE is dissatisfied with Section 3 Second of the RLA, then BMWE will have to

endorse change before Congress. Otherwise, if BMWE desires to submit the Three Disputed Issues before an SBA, BMWE must follow the procedure set forth in Section 3 Second of the RLA.

For parallel reasons, the Court also rejects BMWE's argument that Section 8 of the NLGA bars UP from obtaining injunctive relief in this case. The terms of the NLGA bar a carrier from injunctive relief if the carrier has violated a legal obligation or failed to make "every reasonable effort" to settle the labor dispute through negotiation, mediation, or arbitration. 29 U.S.C. § 108 (West 2003). However, as the Seventh Circuit explained in *United, 243 F.3d at 365:*

> [Section 8 of the NLGA] does not require a party who is already engaging in good-faith efforts to settle the labor dispute through negotiation, mediation, or arbitration to 'exert every reasonable effort' to prevent or end an unlawful strike or work action before seeking judicial relief. Indeed, requiring a carrier to seek a negotiated solution before moving to enjoin an illegal work action would enable unions to use such actions to extort concessions from the carrier during the negotiation process. Such a result would render the union's duty under 45 U.S.C § 152, First a nullity.

If BMWE had demonstrated that UP failed to utilize all reasonable means to resolve the dispute under the RLA, then BMWE would have a stronger case to bar the injunction.

However, BMWE has not made such a showing. UP has offered to arbitrate the individual claims of BMWE workers, which are those claims that have been handled in the proper manner based on the CBA, to which both UP and BMWE voluntarily entered. And the provisions of the CBA and RLA provide mechanisms for resolving the Three Disputed Issues, but BMWE chose not to avail itself of those mechanisms.

Because commerce, the public interest, and the statutory provisions of the RLA are all implicated in this case, the Court must firmly hold BMWE to its duty under the RLA to avoid interrupting commerce. The Court cannot permit BMWE to threaten to strike whenever it is dissatisfied with the terms of its negotiated agreements, and then take shelter under the provisions of the NLGA.

This is not to say that the Court is unsympathetic to BMWE's position. When Congress enacted the RLA, it mandated the arbitration of minor disputes because it thought that arbitration would provide a swift and effective resolution to disputes involving contract interpretation. The evidence submitted by BMWE certainly indicates that, at least in some instances, conventional arbitration presently falls short of meeting this standard.

Moreover, it would appear that submission of the Three Disputed Issues to expedited arbitration before an SBA could resolve the parties' varying interpretations of the Settlement Agreement in an efficient and effective matter, while protecting the union members' job interests. While BMWE's strong advocacy for its members is commendable, UP is not required by law to submit the Three Disputed Issues to expedited arbitration before an SBA at this time, and its refusal to do so – where BMWE has failed to avail itself to the CBA and RLA's dispute resolution procedures – neither violates the RLA nor prevents UP from receiving injunctive relief.

## CONCLUSION

Considering the foregoing, and based on the entire record herein, the Court finds that BMWE's threat to strike violated the RLA, and that an injunction barring the unlawful strike over these issues is warranted, until such time as the CBA and RLA's negotiating provisions have been exhausted. By threatening to strike over a minor dispute, BMWE threatened unlawful conduct, which threat is sufficient to trigger the protections of the RLA. Moreover, the balance of harms favors granting UP's injunction request and

preventing the disruption of commerce threatened by BMWE. Accordingly,

**IT IS HEREBY ORDERED** that: Plaintiff/Counter-Defendant BMWE's request for declaratory relief be, and the same hereby is, **DENIED**.

**IT IS FURTHER ORDERED** that: Defendant/Counter-Plaintiff UP's request for a preliminary injunction be, and the same hereby is, **GRANTED**.

DATED: July 15, 2003          E N T E R:

ARLANDER KEYS
United States Magistrate Judge

# United States District Court
## Northern District of Illinois
### Eastern Division

Brotherhood Maintenance of Way
Empl

**JUDGMENT IN A CIVIL CASE**

v.

Case Number: 03 C 1639

Union Pacific

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff/Counter-Defendant's request for declaratory relief is denied. It is further ordered that Defendant/Counter Plaintiff's request for Preliminary injunction is hereby granted.

Michael W. Dobbins, Clerk of Court

Date: 7/15/2003

Alicia Castillo, Deputy Clerk